UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| JAMES K. SCHENKE, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) No. 4:18 CV 79 |
| THOMAS LEHMAN, *et al.*, | ) |
| Defendants. | ) |

## OPINION and ORDER

This matter is before the court on defendants' second motion to dismiss. (DE #20.) For the reasons set forth below, the motion will be granted.

**I. BACKGROUND**

The following factual allegations come from plaintiff James Schenke's *pro se* amended complaint and the police report attached as an exhibit to his amended complaint. (DE ## 4; 4-1.) The allegations in the amended complaint are largely consistent with the information contained in the police report. However, to the extent that the accounts differ, the court accepts Schenke's version of events as true for the purposes of ruling on the motion to dismiss.

On October 28, 2016, Tippecanoe County Sheriff Department deputies defendants Thomas Lehman and Jodi Rohler responded to a 911 call originating from Schenke's home. (DE # 4-1 at 1.) The caller hung up, and when the dispatcher returned the call it went straight to voicemail. (*Id.*) When Lehman and Rohler arrived, Schenke's wife Shauna answered the door with one of their daughters, 11-year old L.S., who was

crying. (*Id.* at 1; DE # 4 at 3.) Lehman asked Shauna if everything was ok, and Shauna told him that she was in "a little argument" with Schenke, but that they had "things all sorted out and everything is ok." (DE # 4 at 2.) Shauna told the officers that their assistance was unnecessary and unwanted. (*Id.* at 3.) The officers then entered the home without Shauna's permission. (*Id.* at 3.) The officers separated the members of Schenke's family – Schenke, Shauna, L.S., the couple's eight-year-old daughter C.S., and their six-year-old son W.S. – and began questioning the family. (*Id.* at 3, 23.) At the time they entered, the home was quiet and no one had any visible injuries. (*Id.* at 3.)

When Lehman spoke with Schenke, Schenke explained that he had been struggling all morning to get the family packed and out the door for a weekend trip to Chicago. (*Id.* at 13.) At one point, the children began roughhousing – jumping on his back and tugging on his arms – as he attempted to complete the packing. (*Id.*) Schenke was "sweaty" and "still winded and heart pounding" from the children's "attack" on him when, shortly thereafter, the officers knocked on his door. (*Id.* at 17.)

Schenke also told Lehman that L.S. has a history of attacking her parents and that she attacked Schenke earlier that day. (*Id.* at 12.) He claims that earlier that morning, L.S. had thrown things at him, attempted to kick and punch him, and that she had hit him over the head with a suitcase. (*Id.* at 13.) Schenke told Lehman that after L.S. hit him with the suitcase, he hit her once on her waist with a belt. (*Id.*) When L.S. then punched him, he spanked her bottom twice with his hand. (*Id.* at 7-8, 13.) Schenke explained to Lehman that L.S. has an untreated mood disorder, leading to her

2

challenging behavior. (*Id.* at 8.) He told Lehman that L.S. called the police because she did not want to go to Chicago. (*Id.* at 6.)

When Lehman spoke with Shauna, Shauna told him that Schenke had pushed C.S. against the wall, pinned her there with his hand around her throat, and yelled into her ear. (DE # 4-1 at 2.) Shauna told Lehman that C.S. had been crying and talking, so Shauna did not think Schenke squeezed C.S.'s throat. (*Id.*)

Shauna also told Lehman that Schenke hit her in the hip/buttock area with a belt, and that this caused some minor pain. (*Id.*) Shauna told Lehman that Schenke used his body to push her backward and yelled at her not to say slanderous things about him. (*Id.*) She also said Schenke pushed her hard against the wall and threatened that he could slam her head through a wall if he wanted to. (*Id.*) When Schenke spoke to Lehman, Schenke reported that Shauna accused him of being "murderous" and screamed at him, "Go ahead. Slam my head through a wall. Kill me. You know that's what you want to do." (DE # 4 at 22.) While Schenke told Lehman that he did not hit Shauna, he admitted that he grabbed her face around her chin in order to speak with her during their argument. (DE # 4-1 at 1.)

Shauna told Lehman that Schenke had become abusive over the previous few years, and that he had battered her a few times but she had only reported one such incident. (*Id.* at 2.) She told Lehman that Schenke mentally abused their children on a daily basis. (*Id.*) The officers did not see any injuries on Shauna or the children. (DE ## 4 at 7; 4-1 at 2.)

3

Lehman interviewed Shauna in the master bedroom. (DE # 4-1 at 3.) While in the bedroom, Lehman noticed numerous types of ammunition. (*Id.*) Shauna told Lehman that Schenke owned a few different guns, but that none of the guns had been used during the family's dispute that day. (*Id.*) Schenke reported to Rohler that Shauna was afraid that L.S. would use Schenke's guns against the family. (*Id.* at 6.)

Lehman placed Schenke under arrest for domestic battery and Rohler transported Schenke to jail. (*Id.* at 2.) A few hours after his arrest, Lehman questioned Schenke. (DE # 4 at 7.) Schenke asked for counsel, but Lehman continued his questioning and did not provide him counsel. (*Id.*)

In his report, Lehman identified the victims of the domestic battery as Shauna, C.S., and L.S. (DE # 4-1 at 4.) A "no contact" order was completed – listing Shauna and the children on the order. (*Id.* at 2.) Lehman confiscated ten guns from Schenke. (*Id.* at 4.) The officers also contacted the Department of Child Services. (*Id.* at 3.) An Indiana Superior Court later entered a protective order, classifying Schenke as a "dangerous person" and approving the confiscation of Schenke's firearms.[1] (DE # 4 at 7, 11.) The Tippecanoe County Prosecutor ultimately declined to file charges against Schenke. (*Id.* at 2.)

Defendants filed a partial motion to dismiss, addressing several of Schenke's claims. (DE # 13.) This court granted the motion and granted defendants leave to file a

---

[1] It is unclear from the face of the complaint when, or if, Schenke's firearms were returned to him.

second motion to dismiss,[2] addressing Schenke's remaining claims under the Second Amendment, Fourth Amendment, and Fifth Amendment. (DE # 19.) Before the court is defendants' second motion, addressing these claims. (DE # 20.) Schenke did not respond to the motion to dismiss, and the time to do so has passed. This matter is ripe for resolution.

II.     **LEGAL STANDARD**

A judge reviewing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) must construe the allegations in the complaint in the light most favorable to the non-moving party, accept all well-pleaded facts as true, and draw all reasonable inferences in favor of the non-movant. *United States ex rel. Berkowitz v. Automation Aids, Inc.,* 896 F.3d 834, 839 (7th Cir. 2018).

Under the liberal notice-pleading requirements of the Federal Rules of Civil Procedure, the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "While the federal pleading standard is quite forgiving, . . . the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ray v. City of Chicago,* 629 F.3d 660, 662-63 (7th Cir. 2011); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A plaintiff must plead "factual content that allows the court to draw the

---

[2] In this court's Opinion and Order of August 16, 2019, this court dismissed Schenke's claims against all defendants except Lehman and Rohler, and dismissed Schenke's claim for false arrest. (DE # 19.)

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

To meet this standard, a complaint does not need detailed factual allegations, but it must go beyond providing "labels and conclusions" and "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. As the Seventh Circuit explained, a complaint must give "enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Even if the truth of the facts alleged appears doubtful, and recovery remote or unlikely, the court cannot dismiss a complaint for failure to state a claim if, when the facts pleaded are taken as true, a plaintiff has "nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

### III. DISCUSSION

#### A. *Claims Regarding Entry, Seizure, and Questioning*

Liberally construing Schenke's amended complaint, Schenke identifies several claims under the Fourth and Fifth Amendments. He argues that defendants unreasonably entered and searched his home and detained himself and his family for questioning. He also argues that defendants failed to provide a *Miranda* warning, failed to honor his request for counsel, and questioned his children against his will. None of these allegations amount to a constitutional violation. A strikingly similar case, *Hanson v. Dane Cty., Wis.*, 608 F.3d 335 (7th Cir. 2010), demonstrates why these claims must be dismissed.

6

In *Hanson*, a dispatcher received a 911 call, but the connection was broken. *Id.* at 337. When the dispatcher called back, no one answered. *Id.* The defendant police officers were called to the home to investigate. *Id.* The officers entered the home without permission and questioned the occupants: a husband, wife, and their two teenage daughters. *Id.* The officers learned that during a heated argument, the husband bumped into the wife, and the wife called 911. *Id.* The husband was arrested for domestic battery; however, the wife refused to cooperate with the prosecution, and the case was dismissed. *Id.* The husband filed suit under 42 U.S.C. § 1983, alleging that the officers violated his Fourth, Fifth, and Fourteenth Amendment rights. *Id.*

First, the husband claimed that the officers violated his Fourth Amendment rights when they entered his home without probable cause and refused to leave when his wife asked them to go. *Id.* The Seventh Circuit rejected this argument, finding:

> [A] 911 call provides probable cause for entry, if a call back goes unanswered. The 911 line is supposed to be used for emergencies only. A lack of an answer on the return of an incomplete emergency call implies that the caller is unable to pick up the phone—because of injury, illness (a heart attack, for example), or a threat of violence. Any of these three possibilities supplies both probable cause and an exigent circumstance that dispenses with the need for a warrant.

*Id.* (internal citations omitted). Moreover, even though the wife asked the officers to leave, "officers who have probable cause need not cancel an investigation on request." *Id.* at 338. The wife's statement that she was unharmed did not establish that there was no need for further inquiry. *Id.* Additionally, because of the nature of domestic violence,

7

"the police acted reasonably by continuing their investigation and questioning [the wife] and [the husband] out of each other's presence." *Id.*

The husband also challenged the officers' questioning of his daughters outside of his presence, on substantive due process grounds. *Id.* The Seventh Circuit held that because the daughters were not plaintiffs, the husband's suit could only litigate his own rights; not those of his daughters. *Id.* Moreover, the Court noted that it was unaware of any fundamental right to prevent police from questioning a person's children over the parent's objections. *Id.* at 339.

Finally, the husband argued that the officers violated his right against self-incrimination when they questioned him without first delivering the warnings that *Miranda v. Arizona*, 384 U.S. 436 (1966), requires before custodial interrogation. *Id.* The Court held that because the privilege against self-incrimination concerns the use of compelled statements in criminal prosecutions, an interrogation that yields incriminatory evidence that is never used in a criminal trial does not support an award of damages. *Id.* "The police therefore did not violate [the husband's] privilege against self-incrimination, whether or not they should have given him *Miranda* warnings." *Id.* at 340.

Schenke's claims mirror those made by the husband in *Hanson*, and must be dismissed for the same reasons. Lehman and Rohler had probable cause to enter Schenke's home after L.S.'s aborted 911 call, and the dispatcher's subsequent, unanswered return call. When the officers arrived at the Schenke home, there were

signs of a domestic disturbance. Because they had probable cause to enter the home, the officers did not have to terminate their investigation after Shauna requested that they leave. *See id.* at 338.

The officers also did not violate Schenke's rights when they separated the family into different rooms for questioning. *See id.* Moreover, the questioning of Schenke's children did not implicate any of Schenke's constitutional rights.

Finally, as in *Hanson*, Schenke was never prosecuted or tried. Therefore, defendants' failure to provide *Miranda* warnings, or to cease questioning when he requested a lawyer, are not cognizable claims. *Id.* at 339 ("[I]nterrogation that yields incriminatory evidence never used in court does not support an award of damages."). Defendants' motion to dismiss these claims will be granted.

B. *Claims Regarding Seizure of Firearms*

Schenke also challenges the seizure of the firearms from his home as violations of his rights under the Second and Fourth Amendments. Defendants are entitled to qualified immunity regarding their seizure of Schenke's firearms.

"Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014). Here, there is no question that the officers' seizure of the firearms was a discretionary act. *See id.* Moreover, the seizure of the firearms did not

9

violate a clearly established right of which a reasonable person in defendants' position would have known.

Under Indiana law,

(b) A law enforcement officer may confiscate and remove a firearm, ammunition, or a deadly weapon from the scene if the law enforcement officer has:

> (1) probable cause to believe that a crime involving domestic or family violence has occurred;
>
> (2) a reasonable belief that the firearm, ammunition, or deadly weapon:
>
>> (A) exposes the victim to an immediate risk of serious bodily injury; or
>>
>> (B) was an instrumentality of the crime involving domestic or family violence; and
>
> (3) observed the firearm, ammunition, or deadly weapon at the scene during the response.

Ind. Code § 35-33-1-1.5.

Furthermore, Indiana's "red flag" law permits a warrantless seizure of firearms where a law enforcement officer believes that an individual is dangerous, as defined by Indiana Code § 35-47-14-1. *See* Ind. Code § 35-47-14-3 (eff. to June 30, 2019); *Redington v. State*, 992 N.E.2d 823, 830 (Ind. Ct. App. 2013) ("Section 3 provides a mechanism for a law enforcement officer to seize firearms from an individual believed to be dangerous without a warrant."). An individual is "dangerous" for purposes of this statute if: "the individual may present a risk of personal injury to the individual or to another

individual in the future and the individual: . . . (B) is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or emotionally unstable conduct." Ind. Code § 35-47-14-1 (eff. to May 5, 2019). The red flag law provides for the temporary seizure of firearms, and a procedure for judicial review of the seizure. Ind. Code § 35-47-14-5.

Here, defendants are entitled to qualified immunity on Schenke's Fourth Amendment claim because in light of the Indiana law, a reasonable officer in Rohler or Lehman's position could have believed that seizure of Schenke's firearms was lawful. *See Sutterfield*, 751 F.3d at 578 (officers who seized gun during the course of involuntary mental health commitment were entitled to qualified immunity because a reasonable officer could believe, under state law, that the seizure was lawful).

Defendants are also entitled to qualified immunity on Schenke's Second Amendment claim. The Supreme Court has noted that the right to possess a firearm, secured by the Second Amendment, "is not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626 (2008). However, the contours of this right, in this context, remain underdeveloped. "Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention." *Sutterfield*, 751 F.3d at 571. In the absence of clearly established law on this issue, and in light of Indiana's law apparently authorizing the seizure, a reasonable officer in Lehman or Rohler's position would not have known that they were

violating Schenke's rights (if in fact, such a seizure did violate his rights) by confiscating his firearms during the course of his arrest.

IV. **CONCLUSION**

For the foregoing reasons, the court **GRANTS** defendants' second motion to dismiss. (DE # 20.) The Clerk is **DIRECTED** to close this case.

**SO ORDERED.**

Date: April 9, 2020

    s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT